**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240674-U

Order filed August 1, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| CRAIG BILLIE, DAWN BILLIE, SARA DELUCIO, JANET HOPMAN, ANDREW KITTL, SHARON KITTL, DONALD MLADIC, SUSAN MLADIC, GERARD SABO, and DONNA SABO, | ) ) ) ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiffs-Appellants, | ) ) | Appeal No. 3-24-0674 Circuit No. 22-ED-3 |
| v. | ) ) | |
| VILLAGE OF CHANNAHON, | ) ) | Honorable Roger D. Rickmon |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Hettel and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  We affirm the dismissal with prejudice of plaintiffs' complaint under section 2-615 of the Code of Civil Procedure.

¶ 2     In August 2022, plaintiffs—Craig Billie, Dawn Billie, Sara Delucio, Janet Hopman, Andrew Kittl, Sharon Kittl, Donald Mladic, Susan Mladic, Gerard Sabo, and Donna Sabo—sued defendant, the Village of Channahon (the Village) in the circuit court of Will County, after the

basements of their homes suffered recurrent, temporary flooding over the course of several years. In their amended complaint, plaintiffs brought claims under the takings clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 15), and for nuisance and trespass. The Village moved to dismiss (735 ILCS 5/2-619.1 (West 2022)), asserting each count of plaintiffs' complaint failed to state a cause of action and each claim was barred by the statute of repose specified in section 13-214 of the Code of Civil Procedure (Code) (*id.* § 13-214).

¶ 3    The circuit court purported to grant the Village's motion, and plaintiffs appealed. We found plaintiffs' notice of appeal was premature, and we therefore dismissed the appeal for lack of jurisdiction. *Billie v. Village of Channahon*, 2024 IL App (3d) 230114-U. Upon remand, the court entered a final judgment, dismissing with prejudice all counts of plaintiffs amended complaint.

¶ 4    Plaintiffs again appeal, contending the court (1) erred by dismissing their amended complaint, and (2) abused its discretion when it refused their request to take discovery under Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013). We affirm.

¶ 5                                   I. BACKGROUND

¶ 6    The following facts have been gathered from the well-pleaded allegations of plaintiffs' amended complaint, which we accept as true (*Northwestern Illinois Area Agency on Aging v. Basta*, 2022 IL App (2d) 210234, ¶ 33), or are information subject to judicial notice (*O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 18).

¶ 7    The Village is located in Will and Grundy Counties near the Du Page River, Des Plaines River, and the Illinois and Michigan Canal. These waterways—along with the Kankakee River—converge into the Illinois River near the Village. The Du Page River is dammed within the Village's boundaries. The dam, known as the Channahon Dam, was completed in 1930 and is owned and regulated by the Illinois Department of Natural Resources (Department).

¶ 8    Since 1983, the Village has participated in the National Flood Insurance Program, which allows interested persons to purchase flood insurance and is administered by the Federal Emergency Management Agency (FEMA). See 42 U.S.C. § 4001 *et seq.* To participate in the program, the Village adopted land-use and management ordinances comporting with federal regulations. Specifically, on April 6, 1992, the Village adopted Ordinance No. 703 (the ordinance). Channahon Ordinance No. 703 (approved Apr. 6, 1992), codified at Village of Channahon Code of Ordinances, ch. 153 (approved Nov. 6, 1995).

¶ 9    Under the ordinance, the Village's building and zoning officer is charged with its enforcement. Section 505.0 of the ordinance requires the Village, and by extension the officer, to ensure all development activities within any special flood hazard area meet the requirements of the ordinance and to issue a flood plain development permit in accordance with the ordinance. Moreover, section 506.0 of the ordinance requires the officer to "inspect all development projects before, during, and after construction to assure proper elevation of the structure" and to ensure compliance with the ordinance.

¶ 10    In 1992, a developer sought approval from the Village to develop the Indian Trails subdivision on land in the Du Page River's drainage basin, which had been designated by FEMA as a special flood hazard area. A portion of the proposed development, Indian Trails North Unit 1, is at issue in this case. Indian Trails North is bordered by a slough on its northern and northwestern sides. The slough becomes a backwater floodway during flooding events on the Du Page River. The land beside the slough is flood prone due to its highly porous soil and shallow water table. At the time of the developer's request, the Village knew the land was flood prone. It also knew surface floodwater would permeate the porous soil and infiltrate the water table, causing the water table to rise.

3

¶ 11     On September 29, 1992, the Village planning commission reviewed and approved a preliminary plat for Indian Trails North. Before the meeting, the Village's building and zoning officer, Thomas Pahnke, knew Indian Trails North would be located within a special flood hazard area. He also understood lots 13 through 21 and lots 11 and 12 were impaired by base flood elevations[1] of 524 feet and 525 feet, respectively. During the meeting, a member of the commission expressed concern that the lots were in a floodplain and would require flood insurance. Pahnke explained flood insurance would not be necessary "if all elevations of the building are certified by survey saying they are out of [the] flood plain."

¶ 12     On November 16, 1992, the Village board of trustees annexed the land for the entire Indian Trails subdivision and also approved the Indian Trails North preliminary plat. On February 15, 1993, the Village board approved the final Indian Trails North plat, which included a surveyor's certification that lots 13 through 21 of Indian Trails North were within a special flood hazard area designated by FEMA.

¶ 13     Between September 1993 and August 12, 1994, speculative builders submitted to the Village permit applications to construct single-family homes with excavated basements and septic systems on lots 11 through 17 of Indian Trails North. The applications reflected the planned grading, excavation, and soil fill for each lot. They also showed each home would be constructed with heating and air conditioning equipment, hot water heaters, and electrical junction boxes in the basement.

---

[1]A "base flood" is "the flood having a one percent chance of being equalled or exceeded in any given year." 44 C.F.R. § 59.1 (2020). Base flood elevation is a measurement of the potential water level height during a base flood. *Great Rivers Habitat Alliance v. Federal Emergency Management Agency*, 615 F. 3d 985, 989 (2010). In this case, base flood elevation was measured using the North American Vertical Datum of 1929, a system that approximates elevation relative to sea level.

¶ 14    Pahnke granted each application, "which required each lowest floor (basement) elevation of each planned residential new house construction site on each lot constructed at [519] feet," that is, below the base flood elevation. The applications were granted between September 8, 1993, and August 12, 1994. The homes were built, and Pahnke issued certificates of occupancy and compliance for each home. The certificates "certified only compliance with the Village's 'Zoning Ordinance' and not any FEMA [flood insurance program] regulation nor Ordinance 703 itself, which expressly incorporated the FEMA *** regulations." The last such certificate was granted on December 19, 1994.

¶ 15    Plaintiffs are current and "recently former" homeowners in Indian Trails North. They own lots 11 through 17. Hopman and the Mladics purchased their homes from the speculative builders, while the remaining plaintiffs are either the second or third owners of their homes.

¶ 16    On July 16, 1996, the Du Page River flooded, causing the basements of plaintiffs' homes to flood. Days later, several village trustees and FEMA disaster relief representatives viewed the flooding in the slough, including on plaintiffs' lots. The trustees "learned *** that the flood water from the slough had not risen high enough to inundate each *** house [at] grade level but each house basement had been flooded." Then-trustee Wayne Chesson spoke with FEMA representatives and "came to believe *** the subsurface basement floor elevations may have been too deep and had flooded by a risen water table." In May 1998, Chesson received a letter from FEMA, in his capacity as village president, confirming his belief that the basement floor elevations "were too deep" and plaintiffs' basements would flood with each substantial rainfall.

¶ 17    The basements of plaintiffs' homes flooded again in October 2001, August 2007, September 2008, December 2008, March 2009, April 2013, May 2017, October 2017, February 2018, April 2019, and May 2020. On some if not all of these occasions, plaintiffs used one or more

5

gasoline powered pumps to aid their existing sump pumps to expel the water from their basements, running them for multiple days. The floods damaged plaintiffs' basement-located heating and cooling equipment, hot water heaters, electrical equipment, wood framing, drywall, carpet, tile, furniture, and personal possessions. It also resulted in increased radon gas concentration and mold growth in several homes.

¶ 18        After the July 1996 flood, the Village's elected officials and lead administrative personnel began a "conspiracy of silence." The conspiracy's aim was to prevent plaintiffs or their predecessors from discovering the Village's "internal *** [d]evelopment [p]lan" to purposely disregard floodplain regulations and ordinance No. 703 so the Village could realize growth and increased tax revenue. These officials and personnel "had or have (depending upon present status) a special trust relationship, similar to a fiduciary," with their constituents, including plaintiffs. This relationship placed on the officials and personnel "a duty of good faith, fair dealing, and candor."

¶ 19        After the March 2009 flood, several households in Indian Trails North contacted the Village, asking it to investigate the flooding events. The Village "asked an engineering firm to create a proposal to perform a drainage investigation of the Indian Trails Development 'to determine the causes for significant basement flooding in [10] households,' including [plaintiffs' lots] and 'to propose potential solutions in a written report.' " The engineering firm's proposal, however, did not include an investigation into whether the Village had complied with the ordinance and FEMA regulations during the construction of the affected lots. The Village approved the proposal in March 2009.

¶ 20        The engineering firm's report revealed that plaintiffs' basement floor elevations were between 518.65 feet and 519.95 feet. It identified the 10-year flood elevation at 521 feet and the 50-year flood elevation at 522.8 feet. Ultimately, the engineering firm concluded the dam—which

6

was downstream from Indian Trails North—caused the water upstream from the dam to be five feet higher than the water downstream. The firm also concluded the sandy and porous soil in the area made for "easy transmission" of surface floodwater into the water table, raising the water table's height. The firm did not address the Village's conduct in approving the construction of plaintiffs' homes. The firm recommended the Village work with the Department "in design then underway of an additional dam spillway as a potential flood mitigation step." It also recommended the Village consider a "slurry wall" or concrete barrier to stop surface water from infiltrating the water table.

¶ 21   On October 12, 2009, Dawn Billie wrote a letter to Joseph Cook, Jr., who at the time was the village president. Billie asked the Village to buy her out of her home due to the recurrent flooding, asserting the Village had allowed and approved the construction of her home with a basement floor below the base flood elevation. Cook responded via email on October 19, 2009. Cook falsely told Billie that he had asked his staff to investigate the issues involving her and others' basement flooding, and the investigation did not show "that a single state or village regulation was broken, bent, or overlooked in the approval of any of the homes in question." He also falsely told Billie that the Department had removed plaintiffs' lots from the special flood hazard area. Finally, Cook deflected blame from the Village to the Department, so as to falsely imply the Department was the wrongdoer and to ensure any applicable statute of limitations ran.

¶ 22   The April 2013 flood was widespread, causing extensive damage in 20 communities along the river. As a result, Will and Du Page Counties contacted the United States Army Corps of Engineers about performing a study of flooding issues along the river.

¶ 23   After the May 2017 flood, Dawn Billie sent an email to the village president, Missy Schumacher, asking for help to find a solution to the recurrent flooding. In response, Schumacher

7

described the "inherent risks of living so close to water" and stated the Village would "continue to look for and pursue viable remedies." According to plaintiffs, Schumacher's promise was false because she knew no viable flooding solutions or remedies existed. Billie wrote Schumacher again on May 3, 2017, asking the Village to "put some pressure on the government agencies that have the power to offer solutions."

¶ 24 By February 2018, Billie developed the belief that the Village had been "solely at fault" for the recurrent basement flooding. She told Schumacher of her belief via email. Schumacher responded, telling Billie the Village had "followed engineering" standards. Billie forwarded this correspondence to a village trustee to notify him about the purported false statement

¶ 25 Beginning in May 2019, Billie began to research what standards governed the development of plaintiffs' lots and the approval of their eventual improvements. In July 2019, the Army Corps stated that a slurry wall project for the Indian Trail Development, which included plaintiffs' properties, would not be built since it did not meet the Army Corps's cost-benefit criteria.

¶ 26 In January 2020, Billie presented information she had gathered to several village officials. She told them she believed the developmental evaluation and construction process of plaintiffs' lots violated the ordinance and FEMA regulations and caused recurrent basement flooding. Later that month, Billie and her husband Craig met with the village administrator and the director of public works. They asked the Village to buy out their lot. The Village denied the Billie's request.

¶ 27 In June 2020, plaintiffs sued the Village and several of its former and then-current officers, trustees, and employees in federal court. They included in their federal complaint the state-law claims at issue in this appeal. In March 2022, the federal district court dismissed plaintiffs' claims under federal law and declined to exercise supplemental jurisdiction over the state-law claims, and

the dismissal was affirmed on appeal. *Billie v. Village of Channahon*, 2022 WL 846754 (N.D. Ill. 2022), *affirmed* 58 F. 4th 905 (7th Cir. 2023).

¶ 28 In August 2022, plaintiffs refiled their state-law claims in the Will County circuit court. Counts I and II were brought under the Illinois takings clause. Ill. Const. 1970, art. I, § 15. In count I, plaintiffs brought a claim for inverse condemnation, seeking an order compelling the Village to bring a condemnation action against lots 11, 14, 15, and 17, and award them just compensation. In count II, plaintiffs sought "just compensation for special damages" caused by the flooding. Specifically, they sought money damages for damage to their heating and cooling equipment, hot water heater, electrical equipment, wood framing, drywall, carpet, tile, furniture, and personal possessions. They also sought compensation for housing expenses they incurred while their homes were temporarily uninhabitable and for "physical and mental health injuries associated with such catastrophic losses." In count III, plaintiffs asserted the recurrent flooding of their basements was a continuing nuisance and sought injunctive relief and money damages. In count IV, plaintiffs asserted the recurrent flooding of their basements was a continuing trespass and sought the same relief they requested in count III.

¶ 29 The Village moved to dismiss the complaint. 735 ILCS 5/2-619.1 (West 2022). The Village asserted all counts of plaintiffs' complaint failed to state a cause of action. *Id.* § 2-615. Additionally, it contended, among other things, plaintiffs' complaint was barred by the 10-year statute of repose specified in section 13-214 of the Code (*id.* § 13-214). *Id.* § 2-619(a)(5).

¶ 30 In response, plaintiffs moved, under Rule 191(b), to take discovery. They attached Donald Mladic's affidavit. In their motion, plaintiffs asked for the Village's complete records relating to the construction permit application process for each of their homes and any interaction between the Village and the permit holders and/or their contractors during the construction process.

9

Additionally, they asked for leave to depose an unidentified Village representative who could lay the foundation for the records received. The court denied the motion and entered a briefing schedule on the Village's motion to dismiss.

¶ 31    After a hearing, the court granted in part the Village's motion, dismissing with prejudice counts III and IV for failing to state a cause of action. The court did not dismiss counts I and II but directed plaintiffs to add an allegation, if appropriate, stating that the Village *required* plaintiffs to construct the basements at the depth below the base flood elevation. In ruling, the court stated it was "punting" on the statute-of-repose issue raised in the section 2-619 portion of the Village's motion.

¶ 32    Plaintiffs amended their complaint to allege that, by virtue of its permit approvals, the Village required the builders to build the basements at a depth below the base flood elevation. Plaintiffs also repleaded counts III and IV to preserve their right to appeal the court's dismissal of those claims.

¶ 33    The Village moved to dismiss the amended complaint. *Id.* § 2-619.1. The Village renewed its arguments that all counts of the amended complaint failed to state a cause of action and were barred by the 10-year statute of repose.

¶ 34    After a hearing on the motion, the court took the matter under advisement and continued the matter for decision. At the next hearing, the court stated it was going to issue a written opinion but the opinion was not yet ready. The court continued the matter again at the next hearing. Finally, on September 8, 2023, the court announced its decision:

> "I'm waiting still for my opinion to come back to me. But I can tell you at this time the Motion to Dismiss will be granted.

I don't believe this is a taking. I don't believe there's—it was filed in a timely fashion. \*\*\*.

But the order will become effective when I sign the written opinion. \*\*\*."

¶ 35 No written opinion was signed or entered by the court. However, an entry in the docket, dated September 8, 2023, states, "File is Closed/Dismissed." Plaintiffs filed a notice of appeal on October 4, 2023.

¶ 36 We dismissed the appeal for lack of jurisdiction. *Billie*, 2024 IL App (3d) 230474-U. After our mandate issued, the circuit court entered a written order, granting the Village's motion to dismiss because all claims (1) were time barred under section 13-214 of the Code and (2) failed to state a cause of action.

¶ 37 This appeal followed.

¶ 38 II. ANALYSIS

¶ 39 On appeal, plaintiffs contend the circuit court erred in dismissing their amended complaint. In addition, plaintiffs contend the court erred when it denied their request, under Rule 191(b), to take discovery.

¶ 40 A. The Circuit Court Properly Dismissed the Amended Complaint

¶ 41 The Village moved to dismiss plaintiffs' complaint under section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2022)). Section 2-619.1 allows a party to combine motions to dismiss under section 2-615 (*id.* § 2-615) and section 2-619 (*id.* § 2-619). *Kopf v. Kelly*, 2024 IL 127464, ¶ 63. "A motion to dismiss under section 2-615 challenges the legal sufficiency of the plaintiff's claim, while a motion to dismiss under section 2-619 admits the legal sufficiency of the claim but asserts defenses or defects outside the pleading to defeat the claim." (Internal quotation marks omitted.) *Id.* Under either section, the moving party admits the truth of the well-pleaded facts and all

11

reasonable inferences that can be drawn from those facts, and the court must construe the pleadings and any supporting documents in the light most favorable to the nonmoving party. *Id.* We review *de novo* dismissals under either section (*id.*), and we may affirm on any basis supported by the record (*Mayle v. Urban Realty Works, LLC*, 2022 IL App (1st) 210470, ¶¶ 39-40). If we conclude dismissal was proper under either section 2-615 or section 2-619, we need not address the propriety of the dismissal under the other section. See *Rogalla v. Christie Clinic, P.C.*, 341 Ill. App. 3d 410, 420 (2003).

¶ 42        We turn first to the court's determination that dismissal was warranted under section 2-615.

¶ 43                                  1. *Counts I and II*

¶ 44        Counts I and II of plaintiffs' amended complaint are based on article I, section 15 of the Illinois Constitution, which states, "Private property shall not be taken or damaged for public use without just compensation." Ill. Const. 1970, art. I, § 15. This clause provides broader protection than its federal counterpart (the Fifth Amendment) because the Illinois Constitution provides a remedy both for property that is "taken" and property that is "damaged." See *Hampton v. Metropolitan Water Reclamation District of Greater Chicago*, 2016 IL 119861, ¶ 31; compare U.S. Const., amend. V ("private property [shall not] be taken for public use, without just compensation") with Ill. Const. 1970, art. I, § 15 ("Private property shall not be taken or damaged for public use without just compensation as provided by law."). Nevertheless, a taking is defined the same way under both the Illinois and United States constitutions. *Hampton*, 2016 IL 119861, ¶ 13. Thus, when analyzing a claim for a "tak[ing]," as distinct from a claim for a "damag[ing]," we may look to federal cases for guidance. *Strauss v. City of Chicago*, 2021 IL App (1st) 191977, ¶ 50.

12

¶ 45    Initially, we must clarify the nature of counts I and II. In count I, plaintiffs brought an inverse condemnation claim, seeking an order of *mandamus* to compel the Village to file a condemnation claim under article 10 of the Eminent Domain Act (735 ILCS 30/art. 10 (West 2022)). See *Sorrells v. City of Macomb*, 2015 IL App (3d) 140763, ¶ 25 ("In an inverse condemnation proceeding, the property owner initiates an action to obtain an order of *mandamus* to compel the government to file a condemnation claim."). In their brief, plaintiffs state count II was a claim for "constitutional damage to property without a physical taking" under article I, section 15, which was "presented as an alternative claim for the jurors' consideration in a 735 ILCS 30/10-5-65(a) proceeding." They maintain such a claim does not require an actual taking and must be analyzed differently than count I of their amended complaint. (Plaintiffs fail to explain how our analysis should differ.)

¶ 46    Admittedly, a claim for a taking and a claim for a damaging are distinct. See *Sorrells*, 2015 IL App (3d) 140763, ¶ 25. That is, a claim for a taking is proper when the government actually takes or invades the land, and a claim for a damaging is proper when the government does not physically take or invade the land but instead injuriously affects it. *Granite City Moose Lodge No. 272 v. Kramer*, 96 Ill. 2d 265, 271 (1983). And when "no part of the land is taken, a property owner cannot, by *mandamus*, compel proceedings under eminent domain." *Sorrells*, 2015 IL App (3d) 140763, ¶ 25. Indeed, if the government has not taken property, "the property owner's remedy for a governmental disturbance of a property right is an action at law for damages to recover compensation under the Illinois Constitution." *Id.* ¶ 26.

¶ 47    However, we reject plaintiffs' characterization of count II as a claim for a constitutional damaging under article I, section 15, such that it requires a different analysis. Contrary to plaintiffs' assertion, count II was not pleaded in the alternative to count I. Nowhere in the amended complaint

13

did plaintiffs state that count II was brought in the alternative. Of course, the absence of such language is not determinative. See *Abruzzo v. City of Park Ridge*, 2013 IL App (1st) 122360, ¶ 39. But when read as a whole, the amended complaint leaves us no doubt that count II was not brought alternatively.

¶ 48 In count II, plaintiffs listed the personal property they claimed was damaged by the recurrent floods, as well as alternative housing costs and mental anguish, for which they sought compensation. Plaintiffs did not seek the same relief—just compensation for their real property—under a theory that their real property was damaged and not taken. Indeed, plaintiffs alleged the flooding, that is, *a physical invasion*, caused the losses for which they sought compensation in count II. Plaintiffs could validly bring a takings claim based on the loss of personal property. See *City of Chicago v. ProLogis*, 236 Ill. 2d 69, 77-78 (2010) (the Illinois takings clause applies to private property of all kinds and character, including personal property). And, based on the amended complaint's allegations, that is precisely what they did in count II.

¶ 49 We turn now to the facial sufficiency of counts I and II. To state a claim for inverse condemnation, a property owner must allege facts establishing, among other things, an actionable taking has occurred. See *Hampton*, 2016 IL 119861, ¶ 23; *ProLogis*, 236 Ill. 2d at 77. Our supreme court "has defined a taking as a physical invasion of private property or the radical interference with a private property owner's use and enjoyment of the property." *Hampton*, 2016 IL 119861, ¶ 24. It "has also held that a taking occurs when real estate is physically invaded by superinduced additions of water *** so as to effectually destroy or impair its usefulness." (Internal quotation marks omitted.) *Id.* Flooding need not be permanent to constitute a taking under the Illinois Constitution. See *id.* ¶ 23. Courts considering whether temporary flooding constitutes a taking may consider "the time and duration of the flooding, whether the invasion of the property was

14

intentional or whether it was a foreseeable result of an authorized government action, and the character of the land and the owner's reasonable investment-backed expectations regarding the land's use." *Id.* ¶ 25 (citing *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 38-39 (2012)). At base, however, plaintiffs were required to plead facts establishing "government action caused the injury to their properties—that the invasion was the direct, natural, or probable result of an authorized activity." (Internal quotation marks omitted.) *St. Bernard Parish Government v. United States*, 887 F. 3d 1354, 1359-60 (2018).

¶ 50    Plaintiffs' amended complaint is devoid of any allegations establishing the Village caused the recurrent, temporary flooding of plaintiffs' basements. Plaintiffs' theory, as pleaded in their amended complaint, was that the Village approved construction plans that contemplated the construction of basements below the base flood elevation, contrary to the ordinance and FEMA regulations. When the Du Page River floods as a result of heavy rainfall, surface floodwater backs into the slough abutting plaintiffs' property and permeates the porous, sandy soil into the shallow water table, causing the water table to rise through the sump holes in plaintiffs' basements. According to plaintiffs, the Village *required* the basements to be constructed at those depths, because approved construction plans have the force of law and builders may not deviate from them.

¶ 51    Plaintiffs have pointed us to no cases in which a court has found a taking occurred under these circumstances. The sole case cited by plaintiffs, *Arkansas Game & Fish Comm'n*, does not support their position. There, in holding that recurrent, temporary flooding may constitute a taking, the Court surveyed some of its takings cases and recapped the circumstances in which flooding has been classified as a taking. *Arkansas Game & Fish Comm'n*, 568 U.S. at 31-34. In those cases, government construction of a structure caused or contributed to the inundation of flood water. *Id.*;

15

*Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166 (1872) (the state-authorized construction of a dam created a lake, permanently submerging the plaintiff's land); *United States v. Cress*, 243 U.S. 316 (1917) (the government's construction of a lock and dam subjected the plaintiff's land to intermittent flooding); see also *Billie*, 58 F. 4th at 906-07. In *Arkansas Game & Fish Comm'n*, 568 U.S. at 27-28, the purported taking was the result of the government's operation of a dam—the government approved a plan that altered the manner in which water was released from the dam, causing flooding on the plaintiff's land.

¶ 52        Here, plaintiffs have not alleged the Village constructed, authorized the construction of, or maintained and operated a structure that altered the flow of the Du Page River or caused their properties to be inundated with water. And, of course, the Village did not create the rain, the river, or the floodplain. All the Village did here, according to plaintiffs' amended complaint, was approve plans that contemplated the construction of basements below the base flood elevation. Plaintiffs have alleged the Village, in fact, *required* the construction of basements below the base flood elevation. However, they did not allege the speculative builders submitted plans contemplating the construction of a basement above the base flood elevation and the Village then changed the plans, requiring the basements to be constructed below the base flood elevation. Rather, plaintiffs merely alleged the approved plans had the force of law from which the builders could not deviate. In other words, the Village did nothing more than allow plaintiffs' predecessors to act upon their own choices. This does not amount to a taking. *Billie*, 58 F. 4th at 906. Accordingly, because plaintiffs' amended complaint failed to plead facts that constitute an actionable taking, we conclude the circuit court properly dismissed counts I and II of the amended complaint.

¶ 53                                              2. *Count III*

¶ 54        Count III of plaintiffs' amended complaint asserted the recurrent, temporary flooding of their basements constituted a continuing private nuisance. "A private nuisance is the substantial invasion of a person's interest in the use and enjoyment of his [or her] property." (Internal quotation marks omitted.) *Stop Northpoint, LLC v. City of Joliet*, 2024 IL App (3d) 220517, ¶ 38. The invasion must be substantial, either intentional or negligent, and unreasonable. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 204 (1997). "The term nuisance is applied to that class of wrongs which arise from the unreasonable, unwarrantable or unlawful use by a person of his [or her] own property and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage." (Internal quotation marks omitted.) *Gardner v. International Shoe Co.*, 319 Ill. App. 416, 433 (1943); *Merriam v. McConnell*, 31 Ill. App. 2d 241, 244 (1961); accord *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 365 (2004). The physical invasion of flood water may constitute a nuisance if the invasion is repeated or of a long duration. *Colwell Systems, Inc. v. Henson*, 117 Ill. App. 3d 113, 117 (1983) (citing Restatement (Second) of Torts, § 821D, comment e (1979) (the flooding of a person's land is a trespass and may also be a nuisance if repeated or of long duration); accord *Chicago Flood Litigation*, 176 Ill. 2d at 204-05.

¶ 55        In their brief, plaintiffs assert the amended complaint stated a nuisance claim via its allegations (1) of recurrent basement flooding, (2) that "originated" from the slough controlled by the Village, (3) which the Village recklessly allowed to continue after it became aware, in May 1998, that it had permitted the construction of plaintiffs' basements below the base flood elevation. However, plaintiffs' amended complaint contains no allegation that the invasion—the recurrent, temporary flooding of their basements—resulted from the Village's *use of its own property*. See *Merriam*, 31 Ill. App. 2d at 244. To be sure, plaintiffs assert in their brief that the flood water which ended up in their basements "originated" from the slough, which is owned by the Village.

17

But they did not allege the Village used the slough in a manner that caused the invasion of flood water into their basements. *Id.*; see also Restatement (Second) of Torts, § 824, comment b (1979) (nuisance liability "arises because one person's acts set in motion a force or chain of events resulting in the invasion"). Because plaintiffs have not alleged their flooded basements resulted from the Village's use of its own property, we conclude the circuit court properly dismissed count III of plaintiffs' amended complaint.

¶ 56                                   3. *Count IV*

¶ 57        Count IV of plaintiffs' amended complaint asserted the recurrent, temporary flooding of their basements constituted a trespass. "A trespass is an invasion in the exclusive possession and physical condition of land." *Millers Mutual Insurance Association of Illinois v. Graham Oil Co.*, 282 Ill. App. 3d 129, 139 (1996). A defendant trespasses when he or she enters onto the plaintiff's land without permission, invitation, or other right. *Schweihs v. Chase Home Finance LLC*, 2021 IL App (1st) 191779, ¶ 30. The tort of trespass does not require the defendant to enter onto the plaintiff's land; rather, a trespass also occurs when the defendant "*causes* a thing or third person to enter onto it." (Emphasis added.) *Id.* Thus, a trespass may be claimed when the defendant causes floodwater to enter onto a plaintiff's land. See *Colwell*, 117 Ill. App. 3d at 117 (citing Restatement (Second) of Torts, § 821D, comment e (1979).

¶ 58        Count IV fails because plaintiffs failed to allege the Village caused the inundation of water. The flooding of plaintiffs' homes was not caused by the Village's approval of the construction plans. Rather, as the amended complaint alleges, the flooding was caused by natural processes, that is, substantial rainfall, porous soil, and a shallow water table. Accordingly, we conclude the circuit court properly dismissed count IV of plaintiffs' amended complaint.

¶ 59                                 C. Remaining Issues

18

¶ 60       Having affirmed the dismissal of all counts under section 2-615, we need not address whether the claims were barred by section 13-214(b)'s 10-year statute of repose. See *Rogalla*, 341 Ill. App. 3d at 420. And because Rule 191 does not apply to proceedings under section 2-615 of the Code (Ill. S. Ct. R. 191 (eff. Jan. 4, 2013)), we need not address plaintiffs' additional contention that the circuit court erred by denying their request for discovery under Rule 191(b).

¶ 61                                    III. CONCLUSION

¶ 62       For the reasons stated, we affirm the judgment of the circuit court of Will County.

¶ 63       Affirmed.